Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL VII

| UNIVERSIDAD DE PUERTO RICO / RECINTO DE RÍO PIEDRAS<br><br>Recurrida<br><br>v.<br><br>MICHAEL ARES TORRES<br><br>Recurrente | KLRA202400305 | Revisión Administrativa procedente de la Junta de Gobierno<br><br>Sobre:<br>Acción Disciplinaria<br><br>Caso Número:<br>16 DAJG (2023-2024)<br><br>Apelación Número:<br>90.1137 |

Panel integrado por su presidenta, la Juez Domínguez Irizarry, la Juez Grana Martínez y el Juez Pérez Ocasio

Domínguez Irizarry, Juez Ponente

### SENTENCIA

En San Juan, Puerto Rico, a 16 de octubre de 2024.

El recurrente, señor Michael Ares Torres, comparece ante nos para que dejemos sin efecto la determinación emitida por la Junta de Gobierno de la Universidad de Puerto Rico, el 19 de marzo de 2024, debidamente notificada el 9 de abril de 2024. Mediante la misma, el organismo denegó una apelación promovida por el recurrente y, en consecuencia, confirmó la destitución decretada en su contra como Oficial de Seguridad II de la Universidad de Puerto Rico, Recinto de Río Piedras.

Por los fundamentos que expondremos a continuación, se confirma la *Resolución* administrativa recurrida.

### I

El aquí recurrente se desempeñó como Oficial de Seguridad II de la Universidad de Puerto Rico, Recinto de Río Piedras (Universidad), desde el año 2001, hasta su destitución. Previo a dicha determinación, el recurrente tenía registrado en su expediente laboral dos (2) incidentes previos consistentes en una amonestación

escrita y una probatoria de seis (6) meses por cometer faltas administrativas.

Conforme surge de autos, luego de los procesos investigativos pertinentes, el 9 de abril de 2018, la Universidad presentó una *Querella Enmendada*[1] en contra del recurrente. En la misma se alegó que, el 6 de marzo de 2017, este se encontraba reunido con la doctora Grace M. Carro Nieves, Directora de la Escuela Elemental de la Universidad de Puerto Rico (Escuela), luego de que se le convocara para tratar un asunto relacionado a la conducta de uno de sus hijos. En específico, se le imputó que, al entregársele la amonestación de su hijo para que la firmara, el recurrente le expresó a la doctora Carro Nieves lo siguiente: "Dame la porquería esa para firmarla que tengo que trabajar". Igualmente, en la querella se expuso que, acto seguido, el recurrente le dijo a su hijo: "No le des más oportunidades a esta para que te dé amonestaciones, porque ella la tiene contigo y abusa de su poder".  A su vez, también se le imputó el haberle dicho a la doctora Carro Nieves: "A ti lo que te falta es un novio que te haga feliz", así como haber expresado: "Esta vieja pendeja lo que necesita es un macho".  De igual modo, se alegó que, al salir del área de la reunión, el recurrente, dirigiéndose al profesor José Bentancourt Rosario, hizo la siguiente manifestación: "Mira Betancourt, me le acabo de cagar en la madre a la hija de puta de Grace y a su ayudante. Me llaman para que firme un *warning* y ya lo tenían hecho. Qué cojones, mira qué ineficiencia. Esa cabrona, hija de la gran puta".

En la *Querella Enmendada* se adujo que, durante el incidente, ocurrido durante horas laborables, el recurrente vistió su uniforme oficial. Sobre este particular, expresamente se indicó que, el día de los hechos, este registró su tarjeta de asistencia, para el periodo de

---

[1] La *Querella* original del caso se presentó el 23 de febrero de 2018.

la tarde, con entrada a la 1:10 pm y salida a las 4:06 pm, término durante el cual ocurrió la reunión en controversia, sin contar con la debida autorización. Así, como resultado de todo lo antes expuesto, se le notificó la determinación de formularle cargos disciplinarios, a ser ventilados por la vía ordinaria, por violación a las siguientes secciones del Reglamento General de la Universidad de Puerto Rico (Reglamento General): 1) Sección 35.2.15, por utilizar, en las facilidades y terrenos universitarios, lenguaje obsceno, impúdico o agresivo, usualmente constitutivo de provocación suficiente para el ciudadano común, y que, ordinariamente produce violencia o alteración al orden; 2) Sección 35.2.8, por incurrir en actos que, bajo los cánones de responsabilidad moral prevalecientes en la comunidad, constituyen conducta inmoral; 3) Sección 35.2.18, por incurrir en conducta constitutiva de delito en el Estado Libre Asociado de Puerto Rico y que sea perjudicial al buen nombre de la Universidad, como alteración a la paz; 4) Sección 35.2.19, por incurrir en violaciones a la Ley de la Universidad, así como a otros Reglamentos de la Institución, particularmente al Reglamento de la Oficina de Seguridad, por razón de la conducta y el comportamiento imputado, así como por ausentarse de sus funciones sin autorización a los efectos; 5) Sección 35.2.2, por ausencia o abandono injustificado de sus labores y; 6) Sección 35.2.12, por incurrir en alteración maliciosa o falsificación de, entre otros registros, documentos oficiales de la Universidad, con el fin de pasarlo como genuino para obtener beneficios o lograr algún propósito ilegal, ello, por haber registrado su asistencia como presente en su lugar de trabajo durante el periodo en el que estuvo ausente por motivo de la reunión en disputa.

En la querella, la Universidad expresamente indicó al recurrente que se establecía como agravante el hecho de que este había admitido, mediante una *Estipulación* que suscribió el 11 de

abril de 2014, que incurrió en violaciones a las Secciones 35.2.1, 35.2.6 y 35.2.15 del Reglamento General. Las referidas disposiciones, respectivamente, versan sobre incompetencia o incumplimiento de los deberes del cargo o puesto, actos de acometimiento o agresión física contra miembros de la comunidad universitaria y el uso de lenguaje obsceno, impúdico o agresivo dentro de las facilidades universitarias. De igual forma, se le notificó la designación de la licenciada Lizzie Tomasini como la Oficial Examinadora a cargo de presidir el proceso disciplinario correspondiente. A su vez, el recurrente fue advertido de sus derechos durante la celebración de la vista y de su obligación de formular la contestación a la querella.

El 27 de abril de 2018, el recurrente presentó su respuesta a la *Querella Enmendada.* En esencia, expuso que los hechos en disputa acontecieron mientras desempeñaba su rol de padre, no como empleado de la institución universitaria concernida. A la luz de ello, afirmó que el proceso en su contra era uno parcializado e intencionalmente dirigido a lograr su destitución. A su vez, expresó ser miembro de la Hermandad de Empleados No Docentes de la Universidad de Puerto Rico, por lo que solicitó que el proceso en su contra se ejecutara de conformidad con las reglas establecidas por dicho cuerpo, ello tras entender que el Reglamento General no le era de aplicación.

Así las cosas, y tras ciertos trámites, durante los días 2 y 10 de julio de 2018, se celebró la vista formal del caso para dirimir los cargos imputados. En apoyo a su postura, la Universidad ofreció en evidencia los testimonios de la doctora Carro Nieves, del profesor Betancourt Rosario, así como del señor Ramón Luis Resto García, Supervisor de Ciclistas de la División de Seguridad y Manejo de Riesgos de la Universidad. De igual forma, ofreció en evidencia la declaración de la doctora Elizabeth Cuevas de Jesús, Directora

Auxiliar de la Escuela, de la señora Olga Suárez Vicente, Secretaria de la Directora de la Escuela y del profesor Ángel Díaz Cabrera, maestro de Artes Visuales de la Escuela.

Por su parte, y a fin de sostener su postura, el recurrente ofreció en evidencia su testimonio, así como el del señor Javier Pérez Ortega, Oficial de Seguridad II de la Universidad, y el de su señora esposa, Irilka Parrilla Rodríguez. Ambas partes de epígrafe presentaron prueba documental. Por igual, de la transcripción de los procedimientos se desprende que las partes estipularon el documento suscrito por el recurrente el 11 de abril de 2014, en el que admitió haber incurrido en violaciones previas al Reglamento General.

La primera testigo en prestar su declaración lo fue la doctora Carro Nieves, quien, al momento de los hechos, fungía como la Directora de la Escuela Elemental. Al ser inquirida sobre los hechos de autos, indicó que, tras el incidente en controversia, sometió una querella en contra del recurrente. Al abundar, estableció que, el día en cuestión, a saber, el 6 de marzo de 2017, a eso de las 7:45 am, se reportó un evento en la escuela que involucró al hijo del recurrente. Sostuvo que se amonestó al menor y que se procedió a llamar tanto al recurrente como a su esposa, para que acudieran a la Escuela. Sobre ello, indicó que la Directora Auxiliar del plantel, la testigo Cuevas de Jesús, los citó para una reunión a efectuarse a las 3:00 pm. Al proseguir con su testimonio, la doctora Carro Nieves indicó que, tras intentar explicarle al recurrente y a su señora esposa el suceso, este, alterado, la interrumpió y le dijo "que la te[nía] con su hijo"[2]. Añadió que, al entregarle la amonestación del menor, este le dijo: "dame la porquería de *warning* esa para firmarla"[3]. Indicó que, acto seguido, tras recibir el papel de la

---

[2] Véase: Trascripción de vista de 2 de julio de 2018, pág. 122.
[3] *Íd.*

amonestación, el recurrente se dirigió a su hijo y, señalándola, le dijo al menor: "no dejes que esta te dé más amonestaciones"; "ella la tiene contigo"; "ella lo que quiere es expulsarte"; "ella lo que hace es abusar de su poder"; "aquí lo que te queda es poco tiempo en la escuela"; "no permitas que ella te expulse".[4] La doctora Carro Nieves estableció que, luego de dichas expresiones, el recurrente, ya por salir de su oficina, se detuvo y expresamente le gritó: "A ti lo que te hace falta es un novio que te haga feliz".[5] Añadió que, luego de que el recurrente saliera de su oficina, le escuchó decir la palabra "pendeja", así como la frase: "esto no se va a quedar así".[6] La testigo declaró que, por la impresión ante tal reacción, tanto ella como la doctora Cuevas de Jesús, quien estaba presente en la reunión, quedaron temblorosas. Sobre dicho particular, expresó que su secretaria, la testigo Suárez Vicente, entró a su oficina y le indicó que, mientras el recurrente salía, le escuchó decir: "a esa vieja pendeja lo que le hace falta es un macho y eso no se va a quedar así"[7].

En su testimonio, la doctora Carro Nieves afirmó que, dada la conducta del recurrente, al finalizar la reunión, se sintió avergonzada, humillada, asustada y alterada. A su vez, afirmó que lo anterior aconteció en presencia de la esposa del recurrente y el hijo menor de ambos. Por igual, al ser inquirida sobre el comportamiento del recurrente, afirmó que, desde el inicio de la reunión, este estaba alterado, gritando y haciéndole gestos directamente hacia su cara. A su vez, añadió que la situación le provocó sentirse temerosa de encontrarse al recurrente en algún lugar de la institución universitaria, le afectó su estado de ánimo y fue referida a ayuda psicológica. La testigo afirmó que, en el tiempo

---

[4] *Íd.*
[5] *Íd.*
[6] *Íd.*
[7] *Íd.*

que llevaba como Directora de la Escuela, esta era la primera ocasión en la que experimentaba una situación a tal magnitud con un padre. Finalmente, al ser confrontada con su declaración jurada sobre los hechos, autenticó la misma, documento que se marcó como *Exhibit II.*

Al ser contrainterrogada sobre el incidente por el cual se convocó al recurrente y a su esposa a la reunión en la Escuela, la doctora Carro Nieves expresó que el hijo menor de ambos agredió en la cara a otro niño. A su vez, en su declaración indicó que, previo al asunto de autos, en dos (2) ocasiones, tuvo ciertas situaciones con el recurrente, relacionadas a sus hijos. Ahora bien, en cuanto al asunto aquí en controversia, la doctora Carro Nieves se reafirmó en que, durante la reunión objeto de la presente controversia, trataba de hablar, pero el recurrente no se lo permitía. Añadió que, ante la actitud del recurrente, se sintió intimidada, porque este estaba molesto, gritando y se puso de pie frente a ella mientras permanecía sentada en la mesa de reunión. La testigo indicó que este la señalaba, lo que provocó que se sintiera amenazada. A su vez, sostuvo que, dado a que en la oficina había otras personas, se sintió humillada y calificó la situación como vergonzosa. Al ser inquirida, la testigo también se reafirmó en que, ante la situación, el menor se mostró asustado y tembloroso. Igualmente, sostuvo que el recurrente nunca le solicitó que firmara documento alguno relacionado a una licencia para adjudicar el tiempo empleado en la reunión, así como que este vestía su uniforme oficial con el logo de la Universidad.

Al proseguir con su contrainterrogatorio, la doctora Carro Nieves negó haber increpado al recurrente sobre su calidad como padre. Igualmente, al ser inquirida sobre lo que escuchó decir al recurrente mientras este salía de su oficina, se reafirmó en que, tanto la testigo Suárez Vicente como el testigo Díaz Cabrera, le

corroboraron que este profirió insultos en su contra. Por igual, surge que, durante el contrainterrogatorio de la testigo Carro Nieves, la representación legal del recurrente pretendió presentar en evidencia ciertas conversaciones de la plataforma *Whatsapp* sobre mensajes relacionados a una situación entre su hijo y la hija de la testigo. No obstante, la Oficial Examinadora no permitió que dicha prueba se presentara.

La segunda testigo en presentar su declaración lo fue la doctora Cuevas de Jesús, quien, a la fecha de los hechos, fungía como Directora Auxiliar de la Escuela. Sobre el asunto en controversia, declaró que, tras adjudicarse una amonestación al hijo del recurrente, este y su esposa fueron citados, conforme el proceso aplicable, para discutir la misma. Al expresarse en torno a lo sucedido en la reunión en disputa, la testigo sostuvo que, mientras la doctora Carro Nieves intentaba explicarle al recurrente y a su esposa la razón por la cual su hijo fue amonestado, este, dirigiéndose al menor, le dijo: "no puedes dejar que esta te bote y abuse de su autoridad"[8]. Al proseguir, indicó que, después de firmar la amonestación, le dijo a la doctora Carro Nieves: "ojalá que te busques un novio para que seas feliz"[9], procediendo, entonces, a retirarse junto a su hijo y esposa. En su declaración, la doctora Cuevas de Jesús indicó que, una vez finalizada la reunión, tanto ella como la doctora Carro Nieves, se quedaron nerviosas. Al ser inquirida sobre cómo se condujo el recurrente durante la misma, sostuvo que este se mostró incómodo, molesto y hablando en un tono de voz alto. Por igual, la testigo expresó que, luego de la reunión, dado al estado en el que se encontraba la doctora Carro Nieves, esta no pudo cumplir con una reunión posterior que tenía

---

[8] *Íd.*, pág. 164.
[9] *Íd.*

con el testigo Díaz Cabrera, por lo que se vio precisada en atender dicho asunto.

Al ser contrainterrogada y confrontada con el contenido de la declaración jurada que suscribió sobre los hechos, la doctora Cuevas de Jesús se reafirmó en que, durante la reunión en disputa, el recurrente se mostraba alterado y hablando en un tono alto de voz. Igualmente, afirmó que este señalaba a la doctora Carro Nieves mientras vociferaba. La testigo calificó de amenazantes e irrespetuosas las expresiones del recurrente durante la reunión, así como de ofensivas para la mujer, ello, en particular alusión a la expresión "ojalá que te busques un novio para que seas feliz".[10] Al ser inquirida, la testigo indicó que fue la única frase de dicha naturaleza que escuchó y expresó no recordar haber escuchado la frase: "esta vieja pendeja lo que necesita es un macho"[11]. A su vez, tras preguntársele si tenía conocimiento de alguna situación previa entre la doctora Carro Nieves y el recurrente, la doctora Cuevas de Jesús indicó que, en su mejor conocimiento, estos tuvieron una diferencia en cuanto al pago de la cuota de la escuela. La testigo reiteró que, dadas las expresiones del recurrente durante la reunión, se sentía intimidada.

La tercera testigo en declarar lo fue la señora Suárez Vicente, Secretaria de la doctora Carro Nieves. En lo pertinente, mediante su testimonio estableció que, una vez inició la reunión en controversia en la oficina de la doctora Carro Nieves, en recepción, únicamente se escuchaba al recurrente gritando. Al respecto, aclaró que la puerta de la oficina en la que se llevaba a cabo la reunión estaba cerrada, y se reiteró en que, pese a ello, se escuchaba lo que el recurrente decía, con particular alusión a las expresiones que este hizo a su hijo. Añadió que, cuando culminó la reunión, el

---

[10] *Íd.*, pág. 173.
[11] *Íd.,* págs. 173-174.

recurrente, su esposa y su hijo salieron de la oficina y que el recurrente expresamente dijo: "a esta vieja pendeja lo que le hace falta es un novio"[12]. Sobre ello, indicó que, tanto ella como el testigo Díaz Cabrera, quien esperaba en la recepción, se quedaron impresionados y sin palabras. La testigo declaró que había prestado una declaración jurada sobre los hechos, la cual, tras ser autenticada, fue debidamente admitida como *Exhibit* 6.

Al ser contrainterrogada, la señora Suárez Vicente afirmó que, aun con la puerta cerrada, pudo escuchar lo que estaba pasando en la reunión. Sobre tal particular, destacó que ello obedeció al tono de voz del recurrente. Al ser confrontada con el contenido de su declaración jurada, en cuanto a haber hecho constar que le escuchó decir a su hijo "pórtate bien para que no le des excusa a la vieja esta"[13], la testigo se reafirmó en ello. A su vez, al inquirírsele sobre las expresiones del recurrente una vez salió junto a su familia de la reunión, la testigo se sostuvo en que, en la recepción, solo se encontraban ella y el testigo Díaz Cabrera. A su vez, indicó que las doctoras Carro Nieves y Cuevas de Jesús se quedaron dentro de la oficina y que, a dicho momento, la puerta estaba semi abierta.

El cuarto testigo en declarar lo fue el doctor José Betancourt Rosario, profesor de Educación Física en la Escuela. Sobre los hechos de autos, indicó que, el día en cuestión, mientras se dirigía a su vehículo en el estacionamiento de la Escuela, se topó con el recurrente. Sobre tal encuentro, afirmó que este le hizo la siguiente expresión: "Mire, Betancourt, ahí me acabo de cagar en la madre a la directora y a su ayudante por hija de la gran puta, que me mandaron un *warning* del nene y ya el *warning* lo tenía. Mira qué cojones tiene, que ineficientes son".[14] Al abundar, el testigo indicó

---

[12] *Íd.*, pág. 177.
[13] *Íd.*, pág. 180.
[14] *Íd.*, pág. 186.

que el recurrente vestía su uniforme oficial y que se transportaba en la motora de la Universidad. Añadió que, su impresión en cuanto al asunto era que el recurrente desconocía sobre los procesos y que "le chocó" que lo llamaran "para un *warning* que ya estaba hecho"[15]. Al proseguir con su declaración, el testigo Betancourt Rosario indicó que, ante las expresiones del recurrente, se quedó callado. Al ser confrontado con el contenido de la declaración jurada que suscribió sobre los hechos, y tras autenticarla, expresó que allí hizo constar que, tras el incidente, se quedó "en *shock*"[16]. La declaración jurada fue debidamente admitida como *Exhibit.* El testigo afirmó que comentó lo que el recurrente le expresó en la sala de la facultad de la Escuela, porque se estaba hablando de la situación.

En el contrainterrogatorio, el testigo Betancourt Rosario indicó que, cuando se encontró al recurrente, el menor no estaba presente. Admitió que no presenció el incidente acontecido en la oficina de la Directora, más aclaró que se enteró de los detalles de la situación en la sala de facultad de la Escuela, puesto que estaban hablando del tema. El testigo se reafirmó en que, el día de los hechos, el recurrente vestía su uniforme, particularmente una polo con la insignia de la Universidad, y que este se trasportaba en la motora oficial de la Institución.

El quinto testigo en declarar lo fue el señor Ramón Luis Resto García, Supervisor de Ciclistas de la División de Seguridad y Manejo de Riesgos de la Universidad. En lo pertinente, declaró que, como parte de sus funciones, firmaba las tarjetas de asistencia del recurrente, por ser su supervisor inmediato. Al respecto, se le mostró una tarjeta de asistencia y admitió que se trataba de la del recurrente. Al abundar sobre el contenido de la misma para la fecha de los hechos, indicó que la tarjeta reflejó, como hora de entrada al

---

[15] *Íd.*
[16] *Íd.*, pág. 188.

trabajo, las 7:33 de la mañana y, como hora de salida, las 4:05 de la tarde. Al ser inquirido sobre el periodo de descanso del recurrente, el testigo sostuvo que la tarjeta marcaba un intervalo entre las 12:07 de la tarde a la 1:10 de la tarde. A preguntas del representante legal de la Universidad, el testigo Resto García admitió que, el día de los hechos, no estaba presente en el trabajo. Por igual, estableció que el recurrente no sometió a su consideración documento alguno para acreditar que, el día en controversia, estuvo haciendo gestiones personales en la Escuela Elemental de la Universidad. Sobre este asunto, el señor Resto García declaró que el procedimiento que debe seguir un empleado para salir de su área de trabajo es efectuar el debido ponche de salida en su tarjeta. A su vez, sostuvo que, si un empleado de los que supervisa va a hacer alguna gestión breve durante el horario de trabajo dentro de las instalaciones del Recinto, está obligado a ir donde él para obtener la autorización pertinente. No obstante, se reafirmó en que, de tratarse de una gestión en la que va a emplear tiempo considerable, el empleado tiene que ponchar. La tarjeta de ponchar del recurrente fue debidamente admitida como *Exhibit.*

Al ser contrainterrogado, el testigo Resto García indicó que llevaba un término de dos (2) años como supervisor del recurrente. A su vez, nuevamente indicó que, el día de los hechos se encontraba ausente de sus funciones por razón de enfermedad, y que, ese día, el testigo Javier Pérez Ortega fue designado como supervisor interino del personal, quien, indicó, tenía la facultad de autorizar a un empleado para efectuar una gestión personal durante su horario de trabajo. Al proseguir, reconoció que puede darse el caso de que un empleado olvide ponchar, más indicó que, de suceder, habla con la persona para pedir explicaciones. A su vez, nuevamente admitió que firmó la tarjeta de asistencia del recurrente para el día de los hechos, ello por ser parte de sus labores. Igualmente, al ser

inquirido, indicó que no le solicitó al recurrente ningún documento que acreditara sus gestiones en la escuela de su hijo. Del mismo modo, afirmó que la Escuela Elemental se encuentra fuera de las instalaciones del Recinto.

El último testigo en declarar en la vista del 2 de julio de 2018, lo fue el profesor Ángel Díaz Cabrera, maestro de Artes Visuales en la Escuela. En particular, declaró que, el día de los hechos, tenía una reunión con la doctora Carro Nieves en su oficina y con la madre de una estudiante. Indicó que, mientras esperaba a que esta terminara su reunión con el recurrente, a quien afirmó haber saludado por razón de conocerlo, escuchó que este hablaba en un tono de voz alto. Añadió que, mientras salía de la oficina de la doctora Carro Nieves, el recurrente continuaba hablando alto y que, al pasar cerca del área de la Secretaria, le escuchó decir: "lo que le falta es un macho", así como "vieja pendeja"[17]. Tras ser inquirido sobre la reunión que él tenía pautada con doctora Carro Nieves, el testigo indicó que la misma la efectuó la doctora Cuevas de Jesús. Igualmente, al preguntársele sobre cómo percibió al recurrente cuando salió de la reunión aquí en controversia, el profesor Díaz Cabrera afirmó que este se veía bien molesto. El testigo indicó haber suscrito una declaración jurada de los hechos en disputa, la cual, tras ser debidamente autenticada, fue admitida como *Exhibit.*

Al ser contrainterrogado, el testigo Díaz Cabrera indicó que, mientras esperaba en la recepción su turno para la reunión que tenía pautada, la puerta de la oficina de la doctora Carro Nieves estaba cerrada. A su vez, al ser inquirido sobre cómo escuchó al recurrente, se reafirmó en que este hablaba como si estuviera enojado, en un tono de voz "súper alto"[18]. Del mismo modo se sostuvo en que, aun con la puerta cerrada, podía escuchar al

---

[17] *Íd.*, pág. 218.
[18] *Íd.,* pág. 222.

recurrente hablar alto y respondió en la afirmativa, ello, en cuanto a considerar que, dicho tono de voz podía catalogarse como amenazante. Al ser inquirido, indicó que vio salir de la oficina a la esposa y al hijo del recurrente, a quien percibió pálido y un poco tembloroso.

Llegado el segundo día de vista, el 10 de julio de 2018, el aquí recurrente prestó su testimonio. Según declaró, en el año 2001 comenzó a laborar en la División de Seguridad de la Universidad, desempeñándose, al momento de los hechos, como Oficial de Seguridad II. Al proseguir, indicó que, el 26 de junio de 2007, recibió un reconocimiento por haber intervenido en un caso de apropiación ilegal en uno de los edificios del Recinto. A su vez, sostuvo que, el 28 de marzo de 2006, y el 28 de noviembre de 2017, también fue reconocido por, respectivamente, atender otra situación de seguridad en la Universidad y contribuir a la restauración de las facilidades universitarias, luego del paso del Huracán María. El recurrente afirmó que era un empleado comprometido y de buen desempeño. Ahora bien, a preguntas de su representante legal, indicó que, en los últimos diecisiete (17) años de trayectoria laboral, había sido amonestado, por escrito, en una ocasión. Al abundar, sostuvo que ello resultó de un incidente en el que un sujeto lo agredió física y verbalmente y en el que le devolvió los insultos que le profería. Indicó que, como resultado del proceso disciplinario correspondiente estipuló una probatoria de seis (6) meses.

Sobre los hechos aquí en controversia, el recurrente declaró que, el 6 de marzo de 2017, mientras se encontraba en el ejercicio de sus funciones, su esposa se comunicó con él para informarle que, de la escuela de su hijo, se habían comunicado por razón de un incidente en el que el menor se vio involucrado. Indicó, que coordinó con la doctora Cuevas de Jesús una reunión ese día a las 3:00 pm. Al ser inquirido sobre la vestimenta que llevaba, el recurrente

expresó que tenía puesta su camisa de uniforme con el logo de la Universidad, y que estaba identificado con su número de placa. Al abundar sobre los hechos, el recurrente declaró que solicitó al señor Javier Pérez Ortega la autorización correspondiente para acudir a la reunión, quien le indicó que no había inconveniente para ello. Añadió que, acto seguido, acudió a su casillero, se removió su camisa oficial y "arranc[ó] para la escuela"[19]. Según su testimonio, una vez llegó a la Escuela, encontró a su hijo nervioso y, que, al pasar a la oficina de la reunión, estaban presentes la doctora Carro Nieves y la doctora Cuevas de Jesús. El recurrente declaró que la doctora Carro Nieves le expresó que su hijo iba a ser amonestado por haber agredido a otro menor, y que, al inquirirla sobre la necesidad de discutir los pormenores del incidente, esta le indicó que no era necesario, porque su hijo ya había aceptado los hechos y porque ya el *warning* estaba preparado. El recurrente indicó haber reclamado que se le permitiera al niño explicar el evento y que su hijo se puso nervioso. Expresó que, al ver a su hijo en ese estado, le dijo que no tuviera miedo y que le insistió a la doctora Carro Nieves que reuniera al otro menor involucrado, a lo que esta respondió en la negativa. El recurrente sostuvo que comenzó a hablarle a su hijo y, que, tras prohibirle participar en actividades y deportes de contacto físico, le advirtió al menor: "eso va a darle la razón a esta señora para que te dé más"[20]. Igualmente, añadió que le dijo a su hijo que solo le quedaban dos (2) meses en la escuela y que, mientras le hablaba, la doctora Carro Nieves lo interrumpía. Según sostuvo, ante ello, continuó diciéndole a su hijo: "no le des razón a esta señora, ella la tiene cogía contigo, ya tú sabes que no es la primera vez que ella te hace algo y te quiere botar, no le des razones"[21].

---

[19] Véase: Transcripción de Vista del 10 de julio de 2018, pág. 237.
[20] *Íd.*, pág. 239.
[21] *Íd.*

En su declaración, el recurrente expuso que la doctora Carro Nieves le dijo "nosotros sabemos la clase de padre que es usted"[22]. Añadió que, tras ello, esta le requirió que firmara la amonestación y que, en respuesta, le dijo: "deme la porquería esa para firmarla"[23]. Al proseguir, declaró que la miró y le dijo; "mire, señora, usted lo que tiene es maldad, búsquese un novio, váyase de compras, y búsquese algo que le haga feliz, porque usted está mal"[24]. Según sostuvo, acto seguido, él y su familia salieron de la oficina. Al preguntársele sobre su tono de voz durante la reunión, el recurrente expresó que subió un poco cuando la doctora Carro Nieves comenzó a interrumpirlo. Al continuar con su testimonio, indicó que se encontró con el profesor Betancourt Rosario en el estacionamiento de la Escuela y le dijo que lo habían llamado para discutir un *warning* y que, cuando llegó, ya lo tenían preparado. Añadió que también le expresó que la doctora Carro Nieves no iba a estar tranquila hasta expulsar a su hijo. A su vez, admitió que expresamente le dijo: "Ella lo que demostró es ser ineficiente en ese cargo"[25]. El recurrente sostuvo que, en todo momento, actuó en calidad de padre y no como funcionario de la Universidad. También, afirmó que, entre buscar a su hijo y participar de la reunión, estuvo de veinte (20) a veinticinco (25) minutos fuera de sus funciones. Al preguntársele sobre algún proceso posterior, el recurrente expresó que solicitó una orden de protección en contra de la doctora Carro Nieves por maltrato institucional de menores y que, esta, a su vez, inició un proceso judicial en su contra. No obstante, indicó que se allanaron a la recomendación de la Oficial del Departamento de la Familia designada al caso. De igual forma, testificó que supo de la presentación de una querella administrativa informal en su contra

---

[22] *Íd.*
[23] *Íd.*, pág. 240.
[24] *Íd.*
[25] *Íd.,* pág. 242.

por los hechos de autos, a dos (2) semanas de acontecidos los mismos.

Al ser contrainterrogado, el recurrente afirmó que, tras los procesos judiciales previamente indicados, las partes acordaron atender el asunto en controversia mediante los procesos administrativos dispuestos en la Universidad. Al ser inquirido sobre, si el día de los hechos, utilizó la motora oficial de la Institución para trasladarse a la reunión, respondió en la afirmativa y adjudicó dicho proceder a la prisa que tenía por atender la situación de su hijo. Al preguntársele sobre las amonestaciones previas que había recibido durante su trayectoria laboral, el recurrente negó haber sido amonestado por haber sido descubierto jugando dominó en horas laborables. Al respecto, fue confrontado con un documento con fecha del 21 de febrero de 2006, el cual autenticó al reconocer su firma, en el que se hacía constar que se presentó una queja en su contra por dicho incidente, y en el cual admitió haberse apartado de las normas de conducta de su puesto. Al abundar, el testigo admitió que se le dio una amonestación escrita en la cual se le advirtió que, de incurrir en futuras faltas, podía imponérsele una sanción más severa, mas sostuvo que el incidente se produjo, no por jugar, sino por mostrar un juego de dominó a un compañero[26]. Igualmente, el recurrente fue contrainterrogado por la amonestación que recibió como resultado del incidente físico y verbal que tuvo con un individuo, y admitió que, en dicha ocasión, aceptó haber incurrido en actos de agresión física[27].

La próxima testigo en declarar lo fue la señora Irilka Parrilla Rodríguez, esposa del recurrente. En particular, testificó que, el 6 de marzo de 2017, recibió una llamada de la señora Cuevas de Jesús en la que le informó sobre una situación acontecida con su hijo en

---

[26] *Íd.,* págs. 263-264.
[27] *Íd.,* págs. 264-265.

el plantel escolar y en la que se le solicitó su presencia para discutir la situación. Indicó, que se comunicó con el recurrente para que asistiera a la escuela y que este le expresó haber recibido también una llamada relacionada, en la que se le informó sobre la posibilidad de darle un *warning* al niño. La testigo declaró que el recurrente le expresó que habría de solicitar permiso a su supervisor para acudir a la Escuela. Al proseguir, añadió que la reunión se habría de llevar a cabo a las 3:00 pm de ese día. Sobre lo allí acontecido, declaró que se encontraban presentes la doctora Carro Nieves y la doctora Cuevas de Jesús. Según sostuvo, la doctora Carro Nieves les dijo que tenían que firmar la amonestación del niño y que, ante ello, se quedaron sorprendidos, porque pensaban que fueron convocados para discutir la situación. La testigo expresó que el recurrente solicitó que se le explicara la situación y que las funcionarias le expresaron que el niño se vio involucrado en una pelea. Añadió, que su hijo estaba nervioso, que la doctora Carro Nieves lo miraba intimidante y que el niño contó su versión de los hechos. Según declaró, pese a ello, la doctora Carro Nieves les indicó que la amonestación era su determinación final y que, acto seguido, el recurrente le dijo al niño que no se preocupara. La señora Parrilla Rodríguez sostuvo que, acto seguido, la doctora Carro Rodríguez se levantó de su silla y le dijo al recurrente: "nosotros sabemos la clase de padre que usted es"[28], todo, mientras este hablaba con su hijo. Al proseguir, indicó que el recurrente estaba incómodo por la situación, porque el niño estaba nervioso, porque la doctora Carro Nieves lo interrumpía al hablar y, a su vez, indicó que este tenía un tono de voz alto, no obstante, declaró que nunca gritó. Según declaró, la doctora Carro Nieves le requirió al recurrente firmar el

---

[28] *Íd.*, pág. 270.

*warning,* a lo que, conforme indicó la testigo, este respondió diciendo: "deme la porquería de papel ese".[29]

En su declaración, la señora Parrilla Rodríguez expresó que, luego de que el recurrente tomara la amonestación para firmarla, este le verbalizó lo siguiente a la doctora Carro Nieves: "mire, señora, usted tiene maldad en su corazón y, no sé, búsquese un novio o cómprese algo que la haga feliz"[30]. Al continuar, expuso que, tras ello, salieron de la oficina e indicó no recordar haber escuchado a su esposo decir algo más. Añadió que, al llegar al estacionamiento, se encontraron con el profesor Betancourt Rosario y que el recurrente le indicó haber tenido una situación con la Directora de la Escuela relacionada a su hijo que, aunque se le citó para discutir la situación, ya tenía un *warning* hecho en contra del menor. Indicó, que, luego de ello, el recurrente se montó en su motora y ella en su vehículo para salir del lugar. A su vez, indicó que previamente habían tenido ciertos incidentes con la doctora Carro Nieves, relacionados al cobro de una certificación y a otras amonestaciones del menor.

En su contrainterrogatorio, la testigo Parrilla Rodríguez indicó no considerar una falta de respeto la expresión que el recurrente le hizo a la doctora Carro Nieves al momento de firmar el *warning.* A su vez, indicó que escuchó la conversación que este sostuvo con el profesor Betancourt Rosario cuando se encontraron en el estacionamiento, más negó que su esposo se hubiese referido a la doctora Carro Nieves como "esa vieja cabrona, hija de la gran puta"[31].

El último testigo en declarar lo fue el señor Javier Pérez Ortega, Oficial de Seguridad II de la Universidad y quien, el día de

---

[29] *Íd.*, pág. 271.
[30] *Íd.*
[31] *Íd.*, págs. 276-277.

los hechos, fungía como Director Interino de la División de Seguridad. En su testimonio, indicó que, cuando un empleado solicita un permiso para salir dentro de horas laborables, este tiene que comunicarse con su supervisor y ponchar su tarjeta. Sobre el día en controversia, expresó que, a eso de las 2:30 pm, el recurrente le solicitó su autorización para salir a una reunión escolar, ello en calidad de padre. Según declaró, no instruyó al recurrente para actuar como funcionario de seguridad de la Universidad. Al describirlo, indicó que este vestía un jacket color azul y un pantalón azul marino.

En su contrainterrogatorio, el testigo expresó que no firmó la tarjeta de asistencia del recurrente, porque ello era una función del supervisor en jefe. A su vez, admitió que el recurrente no le entregó documento alguno que evidenciara que participó de una reunión escolar. Por igual, al preguntársele si un empleado puede hacer gestiones personales en horas laborables, el testigo respondió en la negativa. Igualmente, el testigo Pérez Ortega expresó que el recurrente debió haber presentado un documento para solicitar una licencia escolar, el cual nunca le proveyó. No obstante, reiteró haberlo autorizado para salir.

El 19 de julio de 2018, el recurrente presentó una *Moción en Solicitud de Desestimación*. En la misma, en esencia argumentó que, luego de la vista celebrada el 2 de julio de 2018, advino al conocimiento de que todos los testigos de la Universidad, una vez declaraban, regresaban al mismo salón en el que esperaban aquellos que aún no habían prestado su testimonio. Así, sostuvo que el proceso estuvo viciado, toda vez que, a su juicio, su debido proceso de ley se transgredió al no observarse los principios probatorios básicos establecidos en el ordenamiento jurídico. Así, solicitó que se desestimaran los cargos administrativos que le fueron imputados.

En respuesta, el 19 de julio de 2018, la Universidad presentó su *Moción en Oposición a Solicitud de Desestimación del Querellado del 16 de julio de 2018*. En específico, argumentó que el proceso promovido en contra del recurrente era uno administrativo que, por su naturaleza, era más flexible y ágil que los procedimientos civiles o penales ordinarios. Añadió, que, en ninguna etapa del trámite en cuestión, el recurrente negó los hechos imputados y planteó que, en su solicitud de desestimación, este tampoco expuso base legal alguna para apoyar su contención. Igualmente, en su comparecencia, la Universidad destacó que, durante la vista del 10 de julio de 2018, el recurrente, por conducto de su representante legal, admitió haberse comunicado con uno de los testigos de la Universidad, ello previo a que este presentara su prueba. Sobre ello, la Universidad expresó que el recurrente omitió indicar dicho dato en su moción, por lo que calificó de meras conjeturas las alegaciones sobre vicio del proceso que expuso en la misma. A su vez, la Institución sostuvo que los testimonios vertidos en la vista fueron compatibles con el contenido de las declaraciones juradas que los testigos suscribieron en el año 2017. De igual modo, la Universidad recalcó que, si bien era su postura que las Reglas de Evidencia no eran de aplicación a los procesos administrativos, de entenderse lo contrario, la Regla 607 (G) de Evidencia, 32 LPRA Ap. VI, R. 607 (G), expresamente provee para que los testigos pudieran estar en la sala donde se lleva a cabo la vista, salvo que, a petición de parte, se ordenara su exclusión del salón de *sesión*. A base de ello, la Universidad afirmó que la referida Regla nada disponía sobre la exclusión de testigos de una sala de *espera*. De este modo, sostuvo que, de una forma u otra, los argumentos del recurrente eran improcedentes en derecho. Así, y sosteniéndose en que el proceso disciplinario en disputa cumplió con todas las garantías del debido

proceso de ley procesal, solicitó que se denegara la desestimación peticionada por el recurrente.

El 31 de julio de 2018, la Oficial Examinadora designada, la licenciada Lizzie Tomasini, emitió el *Informe sobre Vista.* En el mismo, hizo constar que el recurrente solicitó la desestimación de la querella en controversia bajo el fundamento de violación a su debido proceso de ley. En cuanto a este particular, se hizo constar que la Universidad admitió que, en efecto, sus testigos, luego de declarar, permanecían en el mismo lugar. No obstante, del *Informe sobre Vista* surge que, tras entender sobre el planteamiento del recurrente, ello a la luz de la norma aplicable, la Oficial Examinadora dictó que, como norma, las Reglas de Evidencia no son de aplicación en los procesos administrativos adjudicativos y, a su vez, expuso que el recurrente tuvo amplia oportunidad de presentar prueba y de contrainterrogar a los testigos de la Universidad. Añadió, por igual, que, respecto al tema sobre el uso de su uniforme oficial, los testimonios fueron debidamente corroborados por las declaraciones juradas suscritas por los testigos luego de los hechos. En específico, destacó que el testimonio de la doctora Carro Nieves fue contundente en cuanto a este aspecto y que, por ser la primera testigo en declarar, no tuvo oportunidad de coordinar su declaración con algún testigo anterior. De este modo, y tras indicar que el recurrente no aludió a fundamento legal que estableciera la existencia de una obligación de mantener a cada testigo en un cuarto separado, la Oficial Examinadora determinó la improcedencia de la desestimación solicitada.

Respecto a la totalidad de la prueba desfilada ante sí durante los dos (2) días de vista, la Oficial Examinadora resolvió que se estableció que, en efecto, el aquí recurrente incurrió en la conducta imputada. A tales efectos, indicó que se demostró que, el día de los hechos, este, a eso de las 2:30 pm, y luego de obtener la autorización

verbal de su supervisor, el testigo Pérez Ortega, vistiendo su uniforme de Oficial de Seguridad de la institución universitaria recurrida, acudió a la Escuela Elemental de la Universidad en su motora oficial, para participar de una reunión con la Directora del plantel, ello con relación a un incidente con su hijo. Conforme se dispuso, quedó evidenciado que, de conformidad con el protocolo de la Escuela, la funcionaria entregó al recurrente, y a su señora esposa, el *warning* expedido en contra de su hijo para propósitos de que lo firmaran.  Acto seguido, este se dirigió a ella de manera grosera, y, vociferando en un tono alto y apuntándole directamente, le hizo las expresiones imputadas en la *Querella Enmendada*, ocasionándole sentirse avergonzada, aprehensiva y temerosa por su seguridad. En su *Informe,* la Oficial Examinadora hizo constar que los testimonios de la señora Suárez Vicente y del profesor Díaz Cabrera fueron concluyentes en cuanto a haber escuchado al recurrente continuar con los insultos en contra de la doctora Carro Nieves, ello en la forma indicada en la *Querella Enmendada,* una vez este salió de su oficina. Igualmente, la funcionaria dispuso que le mereció entero crédito el testimonio del profesor Betancourt Rosario, el cual, sostuvo, no fue incontrovertido, ello en cuanto a que, cuando el recurrente salió de la reunión en controversia, directamente le expresó, en lo que calificó como un lenguaje vulgar, que había insultado, tanto a la doctora Carro Nieves, como a su asistente.

En su *Informe,* la Oficial Examinadora estableció que la evidencia desfilada ante sí estableció que, la conducta del recurrente provocó que la doctora Carro Nieves se sintiera afectada, se viera impedida de continuar sus labores luego del incidente, sintiera temor y se viera precisada de recibir ayuda psicológica.  A su vez, dispuso que, de acuerdo con la prueba, el día en cuestión, la tarjeta de asistencia del recurrente no reflejó el descuento correspondiente al tiempo en el que estuvo fuera de sus labores oficiales para atender

la situación escolar de su hijo. Igualmente, expuso que este nunca presentó evidencia alguna que acreditara que, el tiempo empleado en dicha gestión, habría de atribuirse a algún tipo de licencia e indicó que su tarjeta de asistencia fue firmada por su entonces supervisor, el testigo Resto García, quien, para la fecha de los hechos, estuvo ausente de sus labores.

A tenor con todo lo antes expuesto, la Oficial Examinadora concluyó que el recurrente infringió las disposiciones de la Ley de la Universidad de Puerto Rico, Ley Núm. 1 de 20 de enero de 1966, 18 LPRA sec. 601, *et seq.,* según enmendada, así como el Reglamento General y el Reglamento de la Oficina de Seguridad, y que incurrió en conducta constitutiva de alteración a la paz, según tipificado en el ordenamiento penal. Al respecto, expuso que su proceder fue uno abusivo, violento, amenazante, irrespetuoso y sexista, ello dado el uso persistente de lenguaje soez, peyorativo e insultante en contra de la doctora Carro Nieves, todo ello dentro de las facilidades de la comunidad universitaria, y en presencia del personal de la Institución recurrida y de su hijo menor de edad. Añadió que, si bien este obtuvo la autorización verbal de quien era su supervisor inmediato el día de los hechos, este se desvinculó de sus funciones al no hacer las gestiones pertinentes para que su tarjeta de asistencia reflejara el tiempo que empleó en la gestión en disputa, al no procurar que dicho tiempo fuera cargado a alguna licencia especial, al utilizar la motora oficial del recinto para trasladarse a la Escuela y al vestir su uniforme oficial durante el incidente. Del mismo modo, indicó que, de la prueba sometida a su escrutinio, surgía que el proceso disciplinario en cuestión, era la tercera vez en la que el recurrente se enfrentaba a sanciones disciplinarias en el ejercicio de sus funciones. De este modo, concluyó que su conducta constituía un patrón que evidenciaba su inhabilidad para rehabilitarse. Así, tras sostener que se demostró que el recurrente

incurrió en los cargos formulados en la *Querella Enmendada*, excepto en la infracción al Artículo 2 de la Sección VI del Reglamento de la Oficina de Seguridad, así como por las violaciones imputadas en cuanto a la Sección 35.2.2 del Reglamento General, la Oficial Examinadora recomendó la destitución del recurrente de su puesto de Oficial de Seguridad II de la Universidad.

Mediante *Resolución* del 9 de agosto de 2018, la Rectora Interina de la Universidad dictó la correspondiente *Resolución.* Tras entender sobre el *Informe sobre Vista* y la recomendación de la Oficial Examinadora, acogió la misma.  En consecuencia, ordenó la destitución del recurrente de su puesto y prohibió su entrada a las inmediaciones de la Institución.

No obstante, en desacuerdo, el 7 de septiembre de 2018, el recurrente presentó *Escrito de Apelación a la Oficina del Presidente.* En esencia, impugnó la medida disciplinaria que le fue impuesta, ello al reproducir sus previos argumentos sobre violación a su debido proceso de ley, al alegar que, se coartó su derecho a presentar evidencia y a confrontar a los testigos en su contra. En igual fecha, presentó una *Moción en Auxilio y Urgente Solicitud sobre Suspensión de Medida Disciplinaria.* En el pliego, calificó de extrema la sanción en controversia, al sostener que la misma le ocasionó un perjuicio sustancial, por lo que requirió que la misma se modificara o se dejara sin efecto.

Por su parte, el 14 de septiembre de 2018, la Universidad presentó escrito sobre *Oposición a Moción en Auxilio de Jurisdicción y a Solicitud para que se deje sin Efecto Suspensión y Medida Disciplinaria.* En lo pertinente, indicó que no procedía modificarse, o dejarse sin efecto la sanción disciplinaria resuelta, hasta tanto se completara el procedimiento de apelación promovido por el recurrente.

De otra parte, el 15 de octubre de 2018, la Universidad presentó su *Contestación a Apelación, Alegato en Oposición.* En lo pertinente, expuso que la *Resolución* impugnada por el recurrente era una conforme a derecho y a la prueba desfilada ante la Oficial Examinadora designada. Al abundar, sostuvo que la destitución decretada, se efectuó de conformidad con todas las disposiciones reglamentarias aplicables a la conducta impugnada, así como en consideración al hecho de que, según estipulado por las partes, en ocasiones previas el recurrente también fue sujeto a otras medidas disciplinarias por razón de su conducta institucional. La Universidad, por igual, sostuvo que el recurrente no estableció que las determinaciones de hechos emitidas en el *Informe sobre Vista* no estaban apoyadas en la evidencia sometida al escrutinio de la funcionaria, ni que fueran erróneas de conformidad con la misma. A su vez, la Universidad se reafirmó en que no solo se demostró que la conducta del recurrente fue una que infringió las normas relativas al orden institucional y a su buen nombre, sino, también, a las pertinentes al desempeño de sus funciones. Sobre ello, nuevamente sostuvo que el recurrente nunca negó los hechos alegados en su contra, ni presentó prueba suficiente para sustentar sus alegaciones, particularmente aquellas relativas a que no violentó sus normas de trabajo al acudir, en horas laborables, a atender la situación escolar de su hijo. De esta forma, y reiterando que el recurrente no aludió a norma de derecho alguna que exigiera la separación de los testigos luego de declarar, ello en cuanto a sus planteamientos sobre infracción al debido proceso de ley, la Universidad solicitó que confirmara la *Resolución* apelada.

Luego de ciertas incidencias acontecidas entre los comparecientes, el 31 de agosto de 2022, la Oficial Examinadora designada para entender sobre la apelación sometida por el recurrente ante la Oficina del Presidente de la Universidad, la

licenciada Alondra Fraga Meléndez emitió su *Informe y Recomendación Final.* En particular, resolvió que, tras examinar la totalidad del expediente pertinente, la medida disciplinaria de la destitución resuelta en contra del recurrente no fue una drástica. Al respecto, dispuso que este no derrotó la legalidad y corrección de las determinaciones de hechos establecidas en el *Informe sobre Vista,* relativas a la conducta que motivó la sanción impugnada, así como que, por razón de faltas previas, había sido apercibido de que, de incurrir en conducta punible según las normas reglamentarias de la Institución, habría de ser separado de sus funciones. La Oficial Examinadora sostuvo que los testimonios de los testigos presentados por la Universidad a fin de sostener los cargos imputados, fueron corroborados por las declaraciones juradas que suscribieron y que, en cuanto a los mismos, no surgía que el recurrente hubiese presentado prueba en contrario. La funcionaria añadió que quedó demostrado que el recurrente también transgredió las normas injerentes al desempeño de sus funciones, ello al vestir su uniforme al momento del incidente, utilizar la motora oficial para transportarte hacia la Escuela de la Universidad y al no descontar ni cargar a licencia especial alguna el tiempo en el que estuvo atendiendo la situación de su hijo. Igualmente, también dispuso que, tal cual lo resuelto, respecto a las alegaciones sobre violación al debido proceso de ley, este no invocó precepto legal alguno que requiriera que, una vez habiendo declarado, en el proceso administrativo concerniente, los testigos que la Universidad debieron haber sido separados. De este modo, la Oficial Examinadora destacada en alzada recomendó que se confirmara la *Resolución* del 9 de agosto de 2018.

Mediante *Resolución* del 22 de noviembre de 2022, notificada el 29 de dicho mes y año, la Oficina del Presidente de la Universidad confirmó la determinación apelada por la cual se ordenó la

destitución del apelante como Oficial de Seguridad II de la Universidad.

No conforme con lo resuelto, el recurrente presentó una *Apelación* ante la Junta de Gobierno de la Universidad. En esta ocasión, además de reproducir sus planteamientos sobre violación al debido proceso de ley, ello bajo el fundamento de que los testigos de la Universidad no fueron separados luego de presentar sus respectivas declaraciones, también indicó que las determinaciones de hechos consignadas en la *Resolución* del 9 de agosto de 2018, según confirmada, incluyeron alegaciones que no formaron parte de la prueba descubierta ni de los cargos formulados en su contra. Así, sostuvo que la actuación agencial en controversia fue una errónea, toda vez que se fundamentó en evidencia no basada en el expediente administrativo. De igual forma, el recurrente también sostuvo que el *Informe y Recomendación Final* suscrito por la Oficial Examinadora, Fraga Meléndez, el cual fue acogido por la Oficina del Presidente, no detalló la conducta por la cual se le imputaron los cargos en controversia, hecho que, a su juicio, debió hacerse constar. A su vez, indicó que, las declaraciones de los testigos que presenciaron el incidente en disputa fueron contradictorias. De este modo, el recurrente solicitó a la Junta de Gobierno que revocara la *Resolución* del 9 de agosto de 2018, según confirmada mediante la *Resolución* notificada el 29 de noviembre de 2022 por la Oficina del Presidente.

El 15 de febrero de 2023, la Universidad presentó *Moción en Cumplimiento de Resoluciones y en Oposición a Apelación.* En esencia, sostuvo que las alegaciones del recurrente eran infundadas, toda vez que la determinación emitida en su contra se fundamentó en prueba debidamente corroborada y creída por la funcionaria a cargo del proceso. Indicó que el proceso de autos cumplió con todos los requisitos legales y reglamentarios aplicables, así como que

observó todas las garantías del debido proceso de ley de las partes involucradas. Así, y tras reiterar que la prueba demostró la comisión de la conducta institucional imputada al recurrente, la Universidad solicitó que se declarara sin lugar la apelación de referencia.

Luego de ciertos incidentes procesales, el 29 de enero de 2024, la Oficial Examinadora designada por la Junta de Gobierno para atender la nueva apelación del recurrente, la licenciada María Soledad Ramírez Becerra, emitió *Informe de la Oficial Examinadora.* En el mismo, efectuó una muy detalla relación de todas determinaciones de hechos del caso, a la luz de la totalidad del expediente administrativo, y resolvió que, a tenor con la prueba presentada, surgía que el recurrente, por la naturaleza de su puesto, debió haber conservado un comportamiento cónsono con las exigencias de conducta establecidas por la Universidad. Dispuso que este conocía que, de incurrir en alguna conducta violatoria de los reglamentos institucionales aplicables al ejercicio de sus funciones, podía ser destituido. La Oficial Examinadora añadió que la prueba desfilada en la vista, en efecto, estableció la conducta imputada en la *Querella Enmendada,* así como que, respecto a él, se observaron todas las garantías procesales pertinentes. En particular, destacó que, en cuanto al planteamiento reiterado sobre el hecho de que no se separaron a los testigos de la Universidad luego de declarar, las Reglas de Evidencia no son de aplicación a los procesos administrativos. No obstante, destacó que, aún considerando su aplicación, dicho cuerpo normativo no exige que los testigos estén reunidos en salones aparte durante una vista. A su vez, añadió que el recurrente no alegó, ni demostró, que los testimonios en cuestión hubiesen sido influenciados en forma alguna.

En su *Informe,* la Oficial Examinadora de la Junta de Gobierno también destacó que, pese a que el recurrente sostuvo que, el día de

los hechos, actuó como padre y no como funcionario de la Universidad, este no demostró haber estado desvinculado de sus funciones durante el incidente. Al respecto, aludió al hecho de que acudió a la reunión en controversia en horas laborables, no reportó el tiempo en el que participó de la misma y estaba debidamente identificado como Oficial de Seguridad de la Institución. Así, a tenor con todo lo expuesto, concluyó que existía evidencia sustancial acreditativa de que el recurrente incurrió en conducta violatoria de las normas de la comunidad universitaria para la cual se desempeñaba. De este modo, recomendó que se declarara *Sin Lugar* su apelación.

El 19 de marzo de 2024, con notificación del 9 de abril de 2024, la Junta de Gobierno emitió su *Decisión de Apelación.* En virtud de la misma, acogió la recomendación de la Oficial Examinadora designada y denegó la apelación en controversia.

Inconforme, y tras denegada una previa solicitud de reconsideración, el 12 de junio de 2024, el recurrente compareció ante nos mediante el presente recurso de revisión judicial. En el mismo formula los siguientes señalamientos:

> Erró la Junta de Gobierno al confirmar, por voz de la Oficial Examinadora, María Soledad Ramírez Becerra, las recomendaciones de la Oficial Examinadora, Alondra Fraga Meléndez, que a su vez confirmó las determinaciones emitidas por la Oficial, Lizzie Tomasini, en su Informe de Vista emitido el 31 de julio de 2018, el cual se hizo formar parte de la Resolución emitida el 9 de agosto de 2018.

> Erró la Junta de Gobierno al confirmar por voz de la Oficial Examinadora María Soledad Ramírez Becerra, las recomendaciones de la Oficial Examinadora, Alondra Fraga Meléndez, al determinar que se cumplieron con las garantías mínimas del debido proceso de ley en el ámbito administrativo.

> Erró la Junta de [G]obierno al confirmar por voz de la Oficial Examinadora, María Soledad Ramírez Becerra, las recomendaciones de la Oficial Examinadora, Alondra Fraga Meléndez, que a su vez confirmó las determinaciones emitidas por la Oficial Examinadora, Lizzie Tomasini, donde se hacen pasar como hechos fácticos y procesales del caso, alegaciones que no

formaron parte de la prueba descubierta por la parte Recurrida previo a la vista administrativa y tampoco fueron incluidas como cargos en la Querella inicial y/o Querella enmendada, violando así el debido proceso de ley que le asiste al aquí Recurrente.

Erró la Junta de Gobierno, al confirmar por voz de la Oficial Examinadora, María Soledad Ramírez Becerra, las recomendaciones de la Oficial Examinadora, Alondra Fraga Meléndez, que a su vez confirmó las determinaciones de la Oficial Examinadora, Lizzie Tomasini, al determinar que la parte Recurrente no citó regla ni precedente legal alguno que requiriera colocar a cada uno de los testigos de la parte Recurrida en salones separados mientras se lleva a cabo la vista del procedimiento administrativo disciplinario, violentando el debido proceso de ley del Apelante y su derecho a presentar evidencia a su favor y en refutación, a contrainterrogar y a confrontar los testigos.

Erró la Junta de Gobierno al confirmar por voz de la Oficial Examinadora, María Soledad Ramírez Becerra, las recomendaciones de la Oficial Examinadora, Alondra Fraga Meléndez, que a su vez confirmó las determinaciones de la Oficial Examinadora Lizzie Tomasini, donde dispone que los testigos presentados por la UPR confirmaron, mediante declaración jurada escrita y testimonial, que el Recurrente profirió específicamente las expresiones que se le imputaron en la formulación de cargos y que el Recurrente no apuntó a prueba alguna en el expediente que demostrar que él no dijo lo que se le imputó que dijo, o que los testigos de la UPR hubiesen mentido.

Erró la Junta de Gobierno al confirmar por voz de la Oficial Examinadora, María Soledad Ramírez Becerra las recomendaciones de la Oficial Examinadora, Alondra Fraga Meléndez, que a su vez confirmó las determinaciones de la Oficial Examinadora, Lizzie Tomasini, donde dispone que la prueba oral sostiene que los testimonios de los testigos de la UPR no fueron inconsistentes respecto a las expresiones que alegadamente profirió el Apelante y que el Apelante.

Erró la Junta de Gobierno al confirmar, por voz de la Oficial Examinadora, María Soledad Becerra Ramírez, las recomendaciones de la Oficial Examinadora, Alondra Fraga Meléndez, donde esta dispone que la parte Apelante no impugnó las determinaciones de hechos emitidas por la Oficial Examinadora, Lizzie Tomasini, ni demostró que las determinaciones de hechos sean erróneas o que no están basadas en el expediente y que se probaron los cargos imputados al apelante.

Erró la Junta de Gobierno al confirmar, por voz de la Oficial Examinadora, María Soledad Becerra Ramírez, las recomendaciones de la Oficial Examinadora, Alondra Fraga Meléndez, donde dispone que las recomendaciones de hechos formuladas por la Oficial Examinadora, Lizzie Tomasini, estuvieron basadas en

su apreciación de la prueba documental y testifical de las partes.

Erró la Junta de Gobierno al confirmar, por voz de la Oficial Examinadora, María Soledad Becerra Ramírez, las recomendaciones de la Oficial Examinadora, Alondra Fraga Meléndez, donde dispone que los hechos en los que la Oficial Examinadora Lizzie Tomasini, basó su análisis de que el Apelante estaba actuando como guardia de seguridad y no como padre no fueron controvertidas por esta parte.

Luego de examinar el expediente de autos, así como a transcripción de los procedimientos en la vista administrativa, y con el beneficio de la comparecencia de ambas partes de epígrafe, procedemos a resolver.

## II

## A

Es norma firmemente establecida en el estado de derecho vigente, que los tribunales apelativos están llamados a abstenerse de intervenir con las decisiones emitidas por las agencias administrativas, todo en deferencia a la vasta experiencia y conocimiento especializado que les han sido encomendados. *Otero Rivera v. Bella Retail Group, Inc.,* 2024 TSPR 70, 213 DPR ___ (2024); *Capote Rivera y otros v. Voilí Voilá Corporation y otros,* 2024 TSPR 29, 213 DPR ___ (2024); *Rolón Martínez v. Supte. Policía,* 201 DPR 26, 35 (2018); *The Sembler Co. v. Mun. de Carolina,* 185 DPR 800, 821-822 (2012); *Asoc. Fcias. v. Caribe Specialty II et al.,* 179 DPR 923, 940 (2010). En este contexto, la Sección 4.5 de la Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico, Ley Núm. 38-2017, establece el alcance de la revisión judicial respecto a las determinaciones administrativas. A tal efecto, la referida disposición legal expresa como sigue:

El Tribunal podrá conceder el remedio apropiado si determina que el recurrente tiene derecho a un remedio.

Las determinaciones de hechos de las decisiones de las agencias serán sostenidas por el tribunal, si se basan

en evidencia sustancial que obra en el expediente administrativo.

Las conclusiones de derecho serán revisables en todos sus aspectos por el tribunal.

3 LPRA sec. 9675.

Al momento de revisar una decisión agencial, los tribunales deben ceñirse a evaluar la *razonabilidad* de la actuación del organismo. *Rolón Martínez v. Supte. Policía,* supra; *The Sembler Co. v. Mun. de Carolina,* supra. Por ello, los tribunales no deben intervenir o alterar las determinaciones de hechos que emita, siempre que estén sostenidas por *evidencia sustancial* que surja de la *totalidad del expediente administrativo.* *Otero v. Toyota,* 163 DPR 716, 727-728 (2005); *Pacheco v. Estancias,* 160 DPR 409, 431-432 (2003). Nuestro Tribunal Supremo ha definido el referido concepto como aquella evidencia relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión. *Rolón Martínez v. Supte. Policía,* supra; *Assoc. Ins. Agencies, Inc. v. Com. Seg. P.R.,* 144 DPR 425, 437 (1997). Por tanto, compete a la parte que impugne la legitimidad de lo resuelto por un organismo administrativo, identificar prueba suficiente para derrotar la presunción de corrección y regularidad que les asiste. *Graciani Rodríguez v. Garage Isla Verde,* 202 DPR 117, 128 (2019).

A tenor con esta norma, los foros judiciales limitan su intervención a evaluar si la decisión de la agencia es razonable y no si hizo una determinación correcta de los hechos ante su consideración. *Assoc. Ins. Agencies, Inc. v. Com. Seg. P.R.,* supra. En caso de que exista más de una interpretación razonable de los hechos, el tribunal debe sostener lo concluido por la agencia, evitando sustituir el criterio del organismo por sus propias apreciaciones. *Pacheco v. Estancias,* supra. Ahora bien, esta regla basada en deferencia no es absoluta. La misma cede cuando está presente alguna de las siguientes instancias: (1) cuando la decisión

no está fundamentada en evidencia sustancial; (2) cuando el organismo administrativo ha errado en la apreciación de la ley, y; (3) cuando ha mediado una actuación irrazonable, o ilegal. *Otero Rivera v. Bella Retail Group, Inc.,* supra; *Costa Azul v. Comisión,* 170 DPR 847, 853 (2007).

**B**

Sabido es que el debido proceso de ley se define como el "derecho de toda persona a tener un proceso justo y con todas las garantías que ofrece la ley, tanto en el ámbito judicial como en el administrativo". *Aut. Puertos v. HEO,* 186 DPR 417, 428 (2012). Esta gracia fundamental "[...] encarna la esencia de nuestro sistema de justicia". *López y otros v. Asoc. de Taxis de Cayey,* 142 DPR 109, 113 (1996). La misma opera en dos vertientes: la sustantiva y la procesal. *U. Ind. Emp. A.E.P. v. A.E.P.,* 146 DPR 611, 616 (1998). La dimensión sustantiva tiene la finalidad de salvaguardar los derechos fundamentales de la persona. *Íd.* Por su parte, en el ámbito procesal, el debido proceso de ley "le impone al Estado la obligación de garantizar que la interferencia con los intereses de libertad y de propiedad del individuo se haga a través de un procedimiento que sea justo y equitativo". *Íd.*

En lo atinente a la materia que nos ocupa, el debido proceso de ley, en su vertiente procesal, se extiende al ejercicio de las facultades adjudicativas delegadas a las agencias, esto por su intervención directa con intereses de estirpe constitucional. *Almonte et al. v. Brito,* 156 DPR 475, 481 (2002). La *adjudicación* constituye el procedimiento mediante el cual una agencia determina los derechos, obligaciones o privilegios que corresponden a una parte. Sección 1.6 (b), Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico, Ley 38-2017, 3 LPRA sec. 9603 (b). De este modo, la ejecución de

la referida garantía necesariamente debe propender al ejercicio de un proceso uniforme para todos los involucrados.

Sobre ello, la Ley 38-2017, *supra,* incorpora en sus disposiciones los criterios necesarios para imprimir legalidad a los procesos administrativos de adjudicación. En particular, la sección 3.1 (a) del aludido estatuto, así como la jurisprudencia interpretativa pertinente, reconocen a todas las partes en un procedimiento adjudicativo las siguientes garantías mínimas del debido proceso de ley en su vertiente procesal: a) notificación adecuada de los cargos o querellas o reclamos contra las partes; b) derecho a presentar evidencia; c) derecho a una adjudicación imparcial y; derecho a que la decisión sea basada en el expediente. 3 LPRA sec. 9641 (a); *Álamo Romero v. Adm. de Corrección,* 175 DPR 314, 329 (2009); *Almonte et al. v. Brito*, supra, pág. 482.

Las antedichas salvaguardas constituyen el medio para asegurar que un organismo administrativo tenga ante sí todos los elementos de juicio necesarios para emitir una decisión adecuada. Por igual, conforme al entendido doctrinal aplicable, sirven para erradicar cualquier manifestación de arbitrariedad administrativa en el ejercicio de las funciones de adjudicación. *López y otros v. Asoc. de Taxis de Cayey*, supra, pág. 113. En materia de derecho administrativo, el debido proceso de ley no tiene la misma rigidez que en los procedimientos penales. *Báez Díaz v. E.L.A.,* 179 DPR 605, 623 (2010). No obstante, el estado de derecho reconoce que el procedimiento adjudicativo pertinente, debe de ser uno justo y equitativo para todas las partes involucradas. *Íd.*

**C**

De otra parte, la Sección 3.13(e) de Ley 38-2017, *supra,* dispone que "[l]as Reglas de Evidencia no serán aplicables a las vistas administrativas, pero los principios fundamentales de evidencia se podrán utilizar para lograr una solución rápida, justa y

económica del procedimiento". 3 LPRA sec. 9653. "La ausencia de aplicar las Reglas de Evidencia a los procesos administrativos persigue el objetivo de 'evitar las trabas procesales de los tribunales de justicia' y propiciar que éstos se realicen con agilidad y sencillez". J.A. Echevarría Vargas, *Derecho Administrativo Puertorriqueño*, 5a ed. rev., Puerto Rico, Ed. SITUM, 2023, pág. 228, citando a *Martínez v. Tribunal Superior*, 83 DPR 717, 720 (1961). En consecuencia, los adjudicadores tienen la responsabilidad de dirimir los conflictos de prueba con el propósito de conocer los hechos necesarios para resolver la controversia. No obstante, ello no implica que los foros administrativos están impedidos categóricamente de aplicar las Reglas de Evidencia. Por tanto, la discreción que, al respecto ejerzan los foros administrativos, debe estar fundamentada sobre una base racional.

**III**

En la causa de autos, el recurrente, en esencia, plantea que la Junta de Gobierno incidió al confirmar la determinación de su destitución, ello al sostener que el proceso administrativo efectuado en su contra no observó las garantías mínimas del debido proceso de ley. Al respecto, específicamente, aduce que, dado a que los testigos de la Universidad no fueron separados, ello a medida en que iban prestando sus declaraciones, su derecho a la confrontación se vio transgredido. De igual modo, alega que, en la adjudicación de la determinación impugnada, se consideraron hechos que no fueron parte de los cargos administrativos imputados en su contra, por lo que, afirma, se inobservó su derecho a ser adecuadamente notificado de los mismos. A su vez, el recurrente impugna la credibilidad que se adjudicó a la prueba testifical y documental presentada por la Universidad y que redundó en la destitución confirmada por la Junta de Gobierno. De la misma forma, y en el contexto de la apreciación de la prueba, el recurrente sostiene que

la Junta de Gobierno incidió al confirmar la determinación por la cual se dispuso que, durante el incidente en controversia, actuó en su capacidad oficial y no en su rol de padre. Habiendo entendido sobre los referidos señalamientos, a la luz del derecho aplicable y de los hechos establecidos, resolvemos confirmar la resolución administrativa recurrida.

Un examen de todos los documentos que componen el expediente que nos ocupa, particularmente de la transcripción de los procedimientos orales, nos mueve a resolver que no se hacen presentes los criterios legales que legitiman nuestra intervención respecto a lo dispuesto por un organismo administrativo. A nuestro juicio, la determinación aquí impugnada obedeció a un ejercicio razonable de apreciación de prueba, a la adecuada función de las facultades legales que le asisten al ente adjudicador concernido, así como, también, a una correcta interpretación y aplicación del derecho pertinente a la controversia de autos.

En principio, intimamos que la prueba presentada a la consideración de la Oficial Examinadora, fue suficiente a los fines de sostener los cargos administrativos imputados en contra del recurrente. Al examinar los testimonios por este impugnados, *vis a vis*, las declaraciones juradas que los testigos de la Universidad suscribieron en cuanto a los hechos, podemos advertir que los mismos se corroboran entre sí, hecho que atribuye entera legitimidad a la determinación emitida. La prueba testifical propuesta por la Universidad fue detallada en cuanto al incidente en controversia. Mediante la misma se estableció que, tal cual lo alegado en la *Querella Enmendada*, el recurrente se condujo, no solo de manera inapropiada durante la reunión que sostuvo con la doctora Carro Nieves, sino, también, violatoria a las normas reglamentarias propias al ejercicio de sus funciones oficiales. La prueba aportada por la institución universitaria concernida fue

consistente en demostrar que el recurrente profesó insultos crasos en contra de la doctora Carro Nieves, ello en los términos aducidos por la Universidad. Su conducta en tal sentido fue recurrente, pues, según hemos podido corroborar, este no limitó su incorrecto proceder al espacio de la reunión en disputa, sino que, al salir de la misma, continuó profiriendo insultos y amenazas en su contra, ello en presencia directa de los testigos que acreditaron la comisión de las faltas imputadas.

Por su parte, la prueba testifical aportada por la Universidad, también fue consistente al establecer que, tal cual lo imputado en la *Querella Enmendada*, el recurrente no solo infringió las normas relativas a los cánones morales y de conducta esperados dentro de las facilidades del Recinto, sino aquellas específicamente dirigidas al ejercicio de su puesto como Oficial de Seguridad II. Al respecto, los testigos que directamente interactuaron con el recurrente el día de los hechos, y sus respectivas declaraciones juradas, establecieron que, durante la reunión en litigio, este vestía su uniforme oficial, estaba debidamente identificado como empleado de la Institución y utilizaba la motora oficial de la Universidad. En cuanto al aspecto del uniforme, los testigos de la Universidad fueron enfáticos al sostener que este lo vestía mientras atendía la situación para la cual fue convocado por la Escuela. Sobre ello, la alegación del recurrente en cuanto a que, previo a acudir a la reunión, se cambió de camisa[32], no suprime la suficiencia de las declaraciones de los testigos de la Universidad sobre el aspecto en discusión. De hecho, su prueba no sostiene su afirmación, puesto que, al declarar en cuanto a ello, sus testigos solo indicaron que este vestía un *jacket* color azul y ninguna alusión hicieron a una camisa distinta. Por su parte, respecto al uso de la motora oficial, precisa destacar que,

---

[32] Véase: Transcripción de vista del 10 de julio de 2018, pág. 237.

mediante su testimonio, el recurrido expresamente admitió que la utilizó para trasladarse desde la División de Seguridad hasta la Escuela, corroborando, de este modo, la declaración del profesor Betancourt Rosario.

Ahora bien, el efecto administrativo de lo anterior, necesariamente va vinculado al hecho de que, conforme se probó, el recurrente, si bien contaba con la autorización verbal del Supervisor Interino de la División de Seguridad para atender la situación de su hijo, no se desvinculó de sus funciones oficiales mientras efectuaba dicha gestión. El uso de su uniforme, así como el de la motora oficial de la Institución, unido al hecho de que nunca descontó de su tarjeta de asistencia el tiempo en el que participó de la reunión en la Escuela de su hijo, ni procuró que el tiempo empleado en la misma se adjudicara a alguna licencia especial, ciertamente infringió los procesos establecidos para dichas instancias. De hecho, la declaración de su testigo, el oficial Pérez Ortega, fue compatible con la del testigo de la Universidad, el señor Resto García, ello en cuanto a que este venía obligado a descontar el tiempo correspondiente de su tarjeta, y respecto a que nunca presentó documento alguno que acreditara una gestión personal efectuada en horas laborables sujeta a adjudicarse a alguna licencia. Por igual, toda vez ello, sus argumentos en cuanto a que debió entenderse que únicamente actuó en calidad de padre durante el incidente en cuestión, se ven derrotados, dado a que la gestión personal que realizó durante horas laborables estuvo matizada por aspectos intrínsecos al ejercicio de sus funciones oficiales.

De otro lado, en su comparecencia, el recurrente se reafirma en que su derecho al debido proceso de ley durante el trámite administrativo efectuado en su contra, fue inobservado. En particular, sostiene que el hecho de que los testigos de la Universidad no fueron separados luego de testificar, lo privó de un

proceso justo y equitativo, lesionando, así, sus intereses propietarios sobre el puesto del cual fue destituido. Sin embargo, tal cual resuelto por la Oficial Examinadora a cargo de la vista, y conforme sostenido por la Junta de Gobierno, nada en el estado de derecho exige que los testigos, tanto en procesos administrativos, como en procesos judiciales, sean colocados en salas de espera independientes. A fin de prevalecer, el recurrente invoca los principios relacionados en materia de derecho probatorio. Sin embargo, además que, como norma, las Reglas de Evidencia no son de aplicación a los procesos administrativos, este cuerpo legal no establece ninguna disposición que respalde su postura. Además, a ello resulta preciso sumar el hecho de que, de la transcripción de los procedimientos de la vista, no surge objeción alguna por parte del recurrente en cuanto al aspecto en cuestión. A su vez, tampoco la prueba establece que el recurrente haya establecido haber sufrido algún perjuicio real a causa de que los testigos de la Universidad hubiesen estado en una misma sala de espera durante la celebración de la vista. Siendo así, y dado a que el recurrente, en efecto, tuvo amplia oportunidad de contrainterrogar a todos los testigos presentados en su contra, ninguna afrenta al debido proceso de ley se cometió.

A igual conclusión llegamos en cuanto a la alegación por la cual el recurrente sostiene que tampoco se cumplió con el derecho a una notificación adecuada de los cargos, ello por alegadamente haberse hecho constar, en las determinaciones de hechos de la Oficial Examinadora, asuntos que no fueron incluidos en la *Querella Enmendada.* En específico, en cuanto a este señalamiento, el recurrente plantea que, en la determinación de su destitución, se consideraron incidentes previos en los que se vio involucrado, independientes al objeto del presente recurso, los cuales se calificaron como agravantes en la consideración de la acción tomada

en su contra. Nuevamente erra en su pretensión. Tal cual indica la Universidad en su comparecencia ante nos, y conforme surge de la prueba admitida durante el proceso en controversia, los cargos por los cuales se le destituyó, exclusivamente obedecen a los hechos acontecidos el 6 de marzo de 2007. No obstante, los agravantes que mediante su señalamiento cuestiona, sí fueron debidamente apuntados en la *Querella Enmendada*, toda vez la alusión a previas amonestaciones que recibió por cierta conducta institucional contraria a las normas de su trabajo. Respecto a la mismas, también surge que las partes estipularon un documento suscrito por el recurrente en el año 2014, en el que admitió haber incurrido en faltas previas, por las cuales recibió dos amonestaciones independientes. Además, sobre uno de dichos incidentes, particularmente acontecido en el año 2006, precisa destacar que fue el propio recurrente quien expuso el asunto durante la vista. Por tanto, ante ello, no podemos sino reputar de inmeritorio su argumento.

Tal cual expresáramos, los pronunciamientos de las agencias administrativas gozan de un amplio margen de deferencia por parte del tribunal revisor, ello dado su conocimiento especializado en la materia que regulan. En virtud de ello, gozan de una presunción de corrección y legalidad. Por tanto, ante dicho escenario, nuestra función estriba en resolver si la determinación impugnada es una razonable a luz de la prueba que obra en el expediente administrativo. Así pues, compete a la parte que se opone a la oponibilidad del dictamen de que trate, identificar alguna prueba en el expediente que derrote la presunción antes aludida. En el caso de autos, la recurrente no señala la existencia de evidencia capaz de invalidar la eficacia del pronunciamiento aquí impugnado. La prueba que obra en el expediente que nos ocupa, sostiene la corrección de la función adjudicativa desplegada, ello a tenor con

los hechos establecidos y el derecho aplicable a los mismos. Por tanto, no podemos sino sostener lo resuelto.

**IV**

Por los fundamentos que anteceden, se confirma la *Resolución* administrativa recurrida.

Lo acordó y manda el Tribunal, y certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones